# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SARAH L. TALBERT, | ) | CASE NO. 8:04CV3321 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM AND ORDER |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1383.  The Court has carefully considered the record and the parties' briefs (Filing Nos. 15, 18).

## PROCEDURAL BACKGROUND

The Plaintiff, Sarah L. Talbert, filed her initial applications for Disability and SSI benefits on May 3, 2001.  (Tr. 80-82, 487-89.)  The claims were denied initially (Tr. 50-53, 491-94) and on reconsideration (Tr. 57-60, 496-99).  An administrative hearing was held before  Administrative Law Judge ("ALJ") Jan E. Dutton on March 12, 2003 (Tr. 503-66).  On April 24, 2003, the ALJ issued a decision finding that Talbert is not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits.  (Tr. 28-43.)  On March 17, 2004, after considering additional evidence (Tr. 470-85), the Appeals Council denied Talbert's request for review.  (Tr. 13-15.)  On August 7, 2004, the Appeals Council set aside its earlier action in order to consider additional information and again denied relief.  (Tr. 9-12.)  Talbert now seeks judicial review of the ALJ's determination as

the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Talbert claims that the ALJ's decision was incorrect because the ALJ failed to consider restrictions noted in an October 2002 physical performance evaluation (Tr. 372-74) and Talbert's need to elevate her legs in determining her residual functional capacity ("RFC") and, therefore, the ALJ's decision is not supported by substantial evidence on the record as a whole.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Talbert is now thirty-nine years old.  (Tr. 80.) She earned a General Equivalency Degree, attended less than one year of college, and completed training in horse shoeing and horse training.  (Tr. 103, 510-11.)  Talbert's most recent occupational experience includes work in a deli and bakery, and also includes work as a deli manager, checker, telemarketer, horse trainer and shoer, cook, machine operator, and housekeeper.  (Tr. 106.)  Since September 14, 1998, Talbert has not engaged in any substantial gainful employment.  (Tr. 509.)

### *Talbert's Testimony*

At the hearing, Talbert amended her alleged date of disability onset to September 14, 1998, claiming an inability to work due primarily to leg discomfort caused by venous insufficiency (Tr. 509, 537).  Talbert also stated that she had back problems from lifting boxes out of a freezer at work and was fired for stealing $5.00.  (Tr. 516-17.)

2

Talbert attended less than one year of college in 1988 and also from 2000 to 2001, achieving passing grades (Tr. 510-11). She supported herself by receiving child support, food stamps, Medicaid, and subsidized housing (Tr. 513-14). She has three children who were ages 17, 13 and 8 at the time of the hearing. (Tr. 512.)

Talbert testified that her blood clots began in 1985 due to a pregnancy, and that she has had clots each time she has been pregnant. (Tr. 517-18.) She testified that she had been taking Coumadin, a blood thinner, since 1985, and her last clot was in June of 2001. (Tr. 518.) Talbert stated that prior to that time her last blood clot occurred in conjunction with the birth of her youngest child in 1994. Talbert testified that she has also had an infection in her legs. (Tr. 519.) Talbert stated that she was hospitalized for several days when she had the clot in 2001 and given medication to break up the clot. (Tr. 520.) Talbert testified that she has always worked with "surface veins" while wearing special stockings, but the veins have enlarged. She stated that she applied for disability because her legs were swollen and her legs "fall asleep" if she sits for a long time. (Tr. 521.) However, Talbert testified that at the time of the hearing she had not worn stockings since September of 2002, because she could not find stockings that fit. (Tr. 522.)

Since Talbert left her job, she was involved in training and caring for horses. (Tr. 523-26.) She would train a horse for about one hour at a time. (Tr. 526.) Talbert suffered the most recent blood clot in June of 2001, when she fell off a horse. (Tr. 526-27.) At the time of the hearing Talbert stated that while she no longer trained horses, she would go to her boyfriend's place and pet the horses. (Tr. 527.) Her boyfriend's auto body shop is on his property, and she would help him lift when necessary. She cannot lift heavy things alone. She also cooks for herself and her family. (Tr. 528, 545.) She does dishes, but

3

stated that it strains her back, which she injured caring for horses in 1991.  (Tr. 528-29.)

Talbert stated that she tried physical therapy for two or three times weekly for two weeks,

and she quit because the therapy did not help.  Talbert takes Tylenol or Ibuprofen for her

back pain.  (Tr. 528.)  Talbert testified that about a year prior to the hearing she saw a back

surgeon,[1] and the surgeon referred her to Company Care to learn back strengthening

exercises, but she "never did get around to doing that."  (Tr. 530.)  Additionally, Talbert

never followed up with the back surgeon.  Talbert opined that she could lift between twenty

and twenty-five pounds with both hands, and that a proper work restriction should prohibit

her from lifting more than fifteen pounds up to one third of an eight-hour workday.  (Tr. 531,

538.)  Talbert said that her back hurts all the time in the lower back and shoulder areas,

and she rated her pain as a 4 or 5 on a 0-10 scale, stating that the pain would decrease to

a 2 or 3 on a good day and increase to an 8 on a bad day.  (Tr. 535.)  Talbert stated that

her back pain has increased, and that in 1991 she would have rated it as a 2 or 3.  (Tr. 536-

37.)  Since 1998, her low back pain reaches into her left leg.  (Tr. 535-36.)  Talbert

acknowledged that walking for exercise and weight loss are recommended for her back

condition, but she stated that her swollen legs keep her from walking more than two blocks

at the most.  (Tr. 532.)  She added that walking two blocks would take her awhile, and she

would have to stop and rest.  (Tr. 539.)  Talbert stated that with medication she had lost

about ten pounds over a period of a couple of months.  (Tr. 532.)  Talbert stated that during

the day she needs to change position from sitting or standing every ten to twenty minutes,

and her need to elevate her legs above her heart would not enable her to return to

---

[1]Talbert's attorney did not know that she sought treatment for her back, and the record does not document this complaint.  (Tr. 530.)

4

telemarketing.  (Tr. 533, 538-39.)  In order to elevate her legs, Talbert testified that she sits in a recliner between forty-five to sixty minutes four or five times daily.  She spends her evenings in a recliner with her legs elevated.  (Tr. 534.)  Talbert estimated that she would need to elevate her legs in this manner twice during an eight-hour workday.  (Tr. 540.) Talbert added that the restrictions with respect to walking, standing, sitting, and elevating her legs have applied to her since June of 2001. (Tr. 540-41.)  After September of 1998, and before June of 2001, Talbert stated that she could probably lift up to twenty or twenty-five pounds up to one-third of an eight-hour workday, sit or stand for twenty-five to thirty minutes, and walk almost one-half of a mile with two rests.  (Tr. 541-42.)  Also after September of 1998, and prior to June of 2001, Talbert would only have to elevate her feet three or four times during the day.  (Tr. 542-43.)

Talbert testified that in 1998 she had a hernia and hysterectomy.  She stated that her hernia had reopened.  (Tr. 537.)

Talbert stated that of her health issues, her venous insufficiency causes her the most pain in the left leg.  (Tr. 537-38.)  She testified that she is very tired, and her fatigue increases with physical activity.  (Tr. 538.)

Talbert stated that since 1998, she has looked in the paper or gone to Job Services to seek a part-time job that would allow flexibility in sitting and standing.  She does not feel that she can work an eight-hour day or up to four hours with the restrictions discussed during the hearing.  She can work with small tools such as screwdrivers or hammers for up to ten or fifteen minutes before her hands cramp due to carpal tunnel syndrome diagnosed

in 1991.  (Tr. 543-44.)[2]  Talbert stated that the condition keeps her from working with her hands, adding that "horse shoeing is a big thing."  (Tr. 545.)  Talbert can wash dishes for ten minutes before she needs a break.  She also has trouble vacuuming, cleaning bathtubs and carrying a laundry basket.  Her children help her with those chores.  She can bathe and dress herself.  (Tr. 546.) Talbert testified that her legs fell asleep during the thirty minute drive to the hearing.  (Tr. 546-47.)  She stated that she can sleep for a couple of hours before being awakened by pain.  Her normal sleeping pattern is to go to bed at about 11:00 or 11:30 p.m.  When she first wakes up at about 2:00 a.m. she gets up, walks around, and sometimes takes aspirin.  At about 4:00 a.m. she returns to bed.  She testified that she averages five and one-half hours sleep per night.  (Tr. 547.)

Talbert stated that since she stopped wearing her stockings about one year before the hearing, she has gone to between six and eight fittings for stockings, but she cannot find stockings that fit her.  As of the hearing date, she had no further scheduled appointment for another fitting.  (Tr. 548.)

Talbert had the clot in June of 2001, after she left school.  When she attended school, she did so on a full-time basis, five days per week, from August to December of 2000.  She testified that she had no accommodation for her legs and did not elevate them during class because they were not as swollen at that time.  (Tr. 549.) Talbert testified that she had ten or eleven blood clots that are the size of fifty-cent pieces in one area of one leg, but the ALJ noted that the record contains no information verifying that claim.  The ALJ

---

[2]The ALJ noted that the record does not document carpal tunnel syndrome.  (Tr. 544.)  This Court notes that Talbert testified that she was "diagnosed" with the affliction, yet never saw a doctor for the condition.  (Tr. 544-45.)

noted where one doctor, Dr. Heber C. Crockett,[3] noted one spot that was suspected to be phlebitis. (Tr. 549.) In response, Talbert's attorney pointed out other leg symptoms in the record such as redness and swelling and a diagnosis of cellulitis. (Tr. 550.) The ALJ noted a venous doppler study was done in September of 2002, and the study was negative for deep vein blood clots. (Tr. 551.) Talbert testified that at the time of the hearing one leg was infected with cellulitis. (Tr. 552.)

**Vocational Expert's Testimony**

Testimony was also heard from a vocational expert ("VE"), William Vincent Tucker, under contract with the Social Security Administration ("SSA").[4] (Tr. 54-57.) The ALJ asked Tucker to assume an individual of Talbert's age, education, and work experience who could lift and carry twenty pounds occasionally and ten pounds frequently, and occasionally climb, balance, stoop and crouch. The individual should not operate foot controls, only seldom kneel and crawl, and avoid hazards and exposure to extreme cold and heat. (Tr. 553-54.)

In response, Tucker testified that the hypothetical individual could perform Talbert's past work as a telemarketer, classified as sedentary but allowing a sit/stand option. (Tr. 554, 557-58.) There was considerable discussion among the ALJ, the attorneys and the VE about the shortcomings of an October 2002, RFC report,[5] which lacks a useful

---

[3]Dr. Crockett is an orthopedist and was primarily concerned with Talbert's knee rather than her venous insufficiency.

[4]William Tucker's curriculum vitae is in the record. (Tr. 68.) The hearing transcript erroneously states Mr. Tucker's middle initial as "D." (Tr. 552.)

[5]The RFC report is in the record. (Tr. 372-74.)

7

summary of Talbert's abilities, whether she can perform work classified as sedentary or light, and why part-time work is recommended.  (Tr: 555-57.)

The VE testified that a telemarketer is a sedentary job.  (Tr. 557.)  The VE then testified:

> Most of the folks that I've seen have been wearing a headset, and they're free to stand up and walk around a little bit in position, as long as they don't leave the workstation.  And so they can input data as they gather it by telephone.  So I would think that the telemarketer, if she's able to be seated as much as six hours out of an eight-hour day, with occasionally getting up and changing position, would be within the parameters of the hypothetical.

(Tr. 557-88.)

The expert further testified that other work in the light category would allow a sit/stand option at the light or sedentary level.  Examples of such work include: assembler of small products; inspector and hand packager; and molding machine operator.  (Tr. 558.) The VE stated that these positions are available in the local and national economies.  (Tr. 557-58.)  The VE acknowledged that, if Talbert had to elevate her leg for one hour during an eight-hour workday, she could not perform any past relevant work or any other work in the national economy.  The VE testified that the job of horse trainer is considered medium in exertion and skilled in nature.  Horse shoeing might be more exertional.  (Tr. 558-59.) The VE opined that between 1998 and June of 2001, assuming Talbert's testimony was accurate, she could have returned to any of the jobs he mentioned.  However, from June of 2001 forward, given Talbert's testimony, no jobs exist in the national economy that Talbert could perform.  (Tr. 560.)

***Documentary Evidence Before the ALJ***

8

In addition to oral testimony, the ALJ considered medical evidence.  The record reflects an ovarian vein thrombosis in 1985 (Tr. 170-77), an extensive right deep vein thrombosis during a pregnancy in 1988 (Tr. 178-81), a left ileofemoral deep vein thrombosis during the same pregnancy in 1988 (Tr. 182-85), right leg deep vein thrombosis in 1994 (Tr. 186-95), and left ovarian vein thrombosis in 1998 (Tr. 196-209). C.M. Lewis, M.D. of the Platte Valley Group saw Talbert on June 15, 1998.  Talbert complained of swelling in her legs.  Dr. Lewis told Talbert that, if she did not wear TED hose, venous insufficiency would continue to be a problem.  Dr. Lewis told Talbert that she did not qualify for disability due to her venous status.  (Tr. 302.)  In September of 1998, Talbert had a hysterectomy. (Tr. 210-16.)  In November 1998, clotting studies were normal.  (Tr. 301.)

May 18, 1999, notes from the Kearney Clinic, P.C. show that Talbert complained of lower extremity swelling, and she was prescribed diuretic medication. (Tr. 257.)  Treatment notes from the same clinic dated January 4, 2000, through May 8, 2000, reflect that Talbert was seen for left leg swelling and thrombophlebitis.  (Tr. 247-53.)  Medication, heat, elevation, and stretching were prescribed.  (Tr. 247-48, 252-53.)

Talbert sought treatment from Heber C. Crockett, M.D., on May 5, 2000, after being pulled off her feet by a horse.  Examination revealed a two plus effusion, left greater than right, bilateral pitting edema, and patella bruising.  (Tr. 310, 426.)  Meniscal testing could not be performed due to pain.  (Tr. 310.)  An MRI revealed some subcutaneous fluid in her left knee, but no particular abnormality.  (Tr. 309, 328.)  Talbert was also checked for deep vein thrombosis, which was negative (Tr. 308, 424).  Talbert was taking antibiotics and elevating her leg, and her swelling had decreased.  (Tr. 308, 424.)  Dr. Crockett prescribed continued elevation, icing, and antibiotics (Tr. 308, 424).  Thereafter, Dr. Crockett ordered

9

a duplex imaging of her left leg to rule out possible superficial thrombophlebitis as well as possible thrombus (Tr. 307, 423).

Lissa Woodruff, M.D., examined Talbert on May 23, 2000, on Dr. Crockett's referral. (Tr. 298-300.) Dr. Woodruff noted that doppler studies were negative for clots, an MRI was "fine," and other studies were negative. (Tr. 298.) Talbert did not exhibit extremity clubbing or cyanosis. Talbert had one plus edema in the right leg and two plus in the left leg. There was swelling and erythema up to her knee and some areas of induration, but no pain with dorsiflexion. Dr. Woodruff's diagnosis was superficial thrombophlebitis, and she recommended heat, elevation and additional prescribed medication. (Tr. 300.)

On May 30, 2000, Talbert stated that her leg was somewhat better, but still bothersome. There was no clubbing or cyanosis, but there was 2+ edema on the right and 2-3+ on the left, as well as some induration and swelling below the right knee. Dr. Woodruff prescribed diuretic medication. (Tr. 297.)

On June 2, 2000, a left lower extremity venous duplex scan showed left calf vein thrombosis. (Tr. 226.) Left lower leg thrombosis and superficial thrombophlebitis were diagnosed. (Tr. 226.) On June 2, 2000, Dr. Woodruff stated that deep venous thrombosis was not present, but Talbert did have superficial clotting. (Tr. 220.) Examination revealed 1-2+ edema in the right leg and 2-3+ edema in the left leg, erythema up to her knee, and below the knee induration and hardness. (Tr. 221.) After diuretic treatment, Talbert was ambulating and able to keep the swelling and pain out of the left leg. (Tr. 218-19.) Consultation with Dr. Lewis revealed bilateral pretibial edema, medial and tibial area thrombosed superficial vein, and mild varicosities. Dr. Lewis's primary diagnosis was recurrent deep vein thrombosis. (Tr. 225.)

On June 9, 2000, Dr. Woodruff found no clubbing or cyanosis, and mild left leg edema. (Tr. 296.) On June 14, 2000, Dr. Lewis noted that Talbert reported that her leg swelling decreased some when she wore her TED hose, but she said the swelling in her legs increased within a few hours of getting out of bed. Her calves ached from the edema, and she had gained four pounds, weighing one hundred fifty-four and one-half pounds. Pretibial 1+ edema and 1-2+ left foot edema were noted. Talbert also had right pretibial 1+ edema (Tr. 295). Dr. Lewis diagnosed superficial thrombophlebitis with some calf deep vein thrombosis with edema secondary to trauma. She prescribed diuretic medication, TED hose, and leg elevation as much and as high as possible. (Tr. 295.)

Surgery was scheduled in June of 2000, to correct an incisional hernia. (Tr. 245.) On June 20, 2000, during a preoperative examination Talbert's left lower leg was swollen and slightly edematous, but less tender and not painful to palpation. (Tr. 245-46.) A June 21, 2000, left lower extremity ultrasound showed widely patent left iliac and common femoral veins with normal phasic flow. The superficial femoral and popliteal veins were also widely patent and showed normal phasic flow. (Tr. 244.) The examining physician, W. T. Sorrell, M.D., diagnosed Talbert with multiple health problems including hyper coagulable state, superficial thrombophlebitis, retro peritoneal adenopathy, and incisional hernia. (Tr. 246.)

Thereafter, on June 29, 2000, Talbert underwent an incisional herniorrhaphy and left perirenal lymph node biopsy, which was benign. (Tr. 232-35.) During an August 10, 2000, followup Dr. Sorrell noted that Talbert was doing well, although her left leg was "a little bit" swollen. (Tr. 242.)

On December 14, 2000, Talbert sought treatment at Kearney Clinic, P.C., for a sore on her lower right leg. She was experiencing edema in both legs. She was given

medication and was advised to lie on her back with her feet against a wall at a ninety-degree angle three times daily for twenty minutes. (Tr. 241.)

On February 22, 2001, Talbert complained of swollen legs with sores. Dr. Woodruff noted that she ran out of her diuretic medication "quite a whole ago" but did not have the prescription refilled. Dr. Woodruff also noted that Talbert's weight had increased thirty pounds since the summer. Examination revealed lower extremity edema, some erythema, and a couple of areas on her legs that were open and draining. Keflex was prescribed, and Talbert's diuretic was reissued. (Tr. 292.) On March 22, 2001, Dr. Woodruff again noted that Talbert had not been taking her diuretic because she complained that it made her light-headed. As a result, she had "a lot more" leg swelling. Dr. Woodruff did not observe clubbing or cyanosis, but she noted 2 to 3+ edema in both legs. She prescribed Lasix to help with Talbert's fluid retention, hoping that this medication would be better tolerated. (Tr. 290.) At the follow-up visit on March 30, 2001, Dr. Woodruff noted that Talbert was wearing TED hose. Talbert was measured for Jobst stockings, but had a hard time wearing them because they were tight. No clubbing, cyanosis, or edema was noted, and Dr. Woodruff increased Talbert's Lasix dosage. (Tr. 291.) On April 11, 2001, Talbert had been eating "a lot" of salt, but she was taking Lasix and was having "pretty good luck" keeping her swelling down. Her legs had 2+ edema, but no clubbing or cyanosis. Dr. Woodruff prescribed knee-high Jobst stockings and an additional diuretic. (Tr. 288.)

On August 31, 2001, Dr. Woodruff noted that Talbert stopped taking her medications while undergoing water therapy. She was still having difficulty finding a time to get fitted for her socks. Examination revealed no clubbing or cyanosis, but she had 3+ edema in both legs and skin changes consistent with chronic venous stasis. (Tr. 287.)

12

In a letter dated September 19, 2001, Dr. Woodruff stated that Talbert had a history of multiple blood clots which led to "significant" venous insufficiency, a condition causing extensive swelling in her left leg.   Dr. Woodruff stated that Talbert's condition was worsened by being on her feet.   Dr. Woodruff opined that Talbert was, at that time, unable to work.  (Tr. 285.)

On October 16, 2001, Talbert again complained of leg swelling and pain behind her right knee.   She was not taking her medication as prescribed.   She did get new hose, but they did not fit correctly and she was not wearing them.   Dr. Woodruff's examination revealed 1 to 2+ edema with a little tenderness behind her right knee.

Talbert next complained of right knee pain on November 19, 2001.   She had full range of motion, no instability, and she was neurovascularly intact.  (Tr. 422.)   Dr. Crockett noted positive meniscal signs and prescribed a repeat MRI, which revealed a meniscal tear. (Tr. 313, 421.)   Surgery was scheduled to repair the tear.   During a December 4, 2001, presurgical examination, Talbert had no extremity clubbing or cyanosis, but she did have 2+ edema.   Dr. Woodruff noted some venous insufficiency changes in both legs.  (Tr. 317.) Talbert was cleared for surgery.  (Tr. 318.)   Surgery was performed on December 4, 2001, and by December 13, 2001, Talbert reported only minimal discomfort (Tr. 319, 420).

On January 21, 2002, Dennis P. McGowan, M.D., examined Talbert on Dr. Crockett's referral.  (Tr. 470-71.)   Dr. McGowan noted that Talbert's gait was upright and without list or flexed posture.   There was no calf tenderness or pedal edema.   Talbert stated that discomfort from her deep vein thrombosis was "occasionally" a five to six on a ten point pain scale.   Dr. McGowan opined that Talbert's excess body weight contributed to her level of symptoms and suggested that she would benefit from a regular exercise program, including aerobic conditioning.  (Tr. 470.)

13

On March 5, 2002, Talbert's legs were swollen and she admitted that she had stopped using her medications prescribed to lessen her leg swelling. (Tr. 412.) Subsequently, on April 10, 2002, Dr. Woodruff opined that Talbert was unable to perform work requiring her to be on her feet for any significant amount of time and that she was "disabled." (Tr. 427.)

Talbert next sought treatment on June 20, 2002, after being hit in the head with a very large hail stone. Dr. Woodruff noted no extremity clubbing or cyanosis, but there was 2+ edema. (Tr. 410.) On July 9, 2002, Talbert's legs showed a large amount of peripheral edema due to venous insufficiency. (Tr. 407.)

On September 4, 2002, Dr. Woodruff next noted that Talbert had not yet bought hose that fit and was noncompliant with her diuretic medication. Venous doppler studies were negative for blood clots. Examination revealed 3-4+ edema in the left leg, 1-2+ plus edema in the right leg, and very tender and superficial areas that were questioned as superficial clots. Dr. Woodruff cautioned Talbert to use her diuretic medication regularly. (Tr. 405.) During follow-up on September 12, 2002, Dr. Woodruff noted that Talbert had been taking her medications "pretty regularly" and had diuresed "nicely." Talbert stated that she had "a little" leg cramping, but "nothing too serious." Dr. Woodruff found some discoloration of venous stasis, 1-2+ plus edema, and some palpable nodule areas that she questioned as superficial thrombophlebitis. (Tr. 403.) On September 26, 2002, Dr. Woodruff noted very swollen and edematous legs with some skin changes of chronic venous stasis. (Tr. 401, 483.)

Talbert underwent a physical performance evaluation on October 7, 2002, upon Dr. Woodruff's referral. (Tr. 372-99.) The examination report indicated that she gave "near full, though not entirely full" effort. (Tr. 372.) During testing she lifted fifteen pounds from floor

to knuckle and twenty pounds from shoulder to overhead, and carried twenty pounds a distance of thirty feet.  She also pushed thirty pounds and pulled thirty-three pounds for a distance of thirty feet.  (Tr. 373.)  Knee flexion was performed to one hundred thirty-five degrees, bilaterally, and she showed 4/5 to 5/5 muscle strength.  (Tr. 386.)   The report concluded that Talbert had the ability to occasionally sit, stand, walk, climb stairs, and perform overhead and forward reaching, but she should kneel and crouch on a limited basis.  The following was recommended: part-time work up to four hours daily if she can change positions as needed; vocational rehabilitation to seek employment within her physical abilities; elevation of her legs intermittently to control lower extremity edema; an appointment with her physician to discuss a possible blood clot in her left calf; and a low impact supervised rehabilitation focusing on improving her cardiovascular fitness.  Several activities were suggested, and the name of a specific program was provided.  (Tr. 374.)

Thereafter, on November 11, 2002, Dr. Woodruff stated that Talbert was doing "pretty well" and she had only a trace of edema.  (Tr. 478.)  However, on February 6, 2003, she had not been taking her diuretic.  Her exam showed 3-4+ left leg edema and 2-3+ edema on the right.  Dr. Woodruff again noted that Talbert was not very compliant with her medication regimen and encouraged her to take her medications regularly.  (Tr. 475.)

## THE ALJ'S DECISION

The ALJ found that Talbert is not "disabled" pursuant to her applications for disability benefits under Disability or SSI benefits under Title XVI benefits.  (Tr. 43.)  The ALJ framed the issues as: 1) whether Talbert is disabled; and 2) whether the disability insured status requirements of the Act were met for purposes of entitlement.   (Tr. 29.)

15

The ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920[6] to determine whether Talbert was disabled, considering:

> any current work activity, the severity of any medically determinable impairment(s), and the individual's residual functional capacity with regard to . . . her ability to perform past relevant work or other work that exists in the regional and national economies.  This latter step requires an assessment of the individual's age, education and past work experience.

(Tr. 29.)

Following this analysis, the ALJ found that Talbert is not disabled.   (Tr. 43.) Specifically, at step one the ALJ found that Talbert has not performed any substantial gainful work activity since September 14, 1998.  (Tr. 29.)  At step two, the ALJ found that Talbert has two medically determinable impairments that are "severe" within the meaning of the SSA's regulations: deep vein thrombosis; chronic venous insufficiency; and obesity. (Tr. 36.)  At step three, the ALJ found that Talbert's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings."  The ALJ noted that Talbert did not contend that her impairments met the listings. (Tr. 36.)  At step four, the ALJ determined that, despite Talbert's medically determinable impairments, she possessed the RFC to perform her past relevant work as a telemarketer. (Tr. 41-42.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.  Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the

---

[6]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits.  For simplicity, further references will only be to § 404.1520.

district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirm that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that she has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

SEQUENTIAL EVALUATION

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 416.920. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) if the claimant cannot perform past relevant work, whether the impairment prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

In this case, the ALJ completed the evaluation process, concluding:

1) Talbert has not performed substantial gainful work activity since May 3, 1999; 2) Talbert has two medically determinable impairments that are "severe" within the meaning of the SSA's regulations, lumbar strain and minor degenerative disc disease of the thoracic spine; 3) Talbert's medically determinable impairments, either singly or collectively, do not meet the "listings"; and 4) despite Talbert's medically determinable impairments, she possessed the RFC to perform her past relevant work as a telemarketer.

TALBERT'S ARGUMENT

Talbert argues that, in determining her RFC, the ALJ did not consider limitations contained in an October 2002, physical performance evaluation (Tr. 372-75) or the recommendations of her physicians that she elevate her legs.

PAIN ANALYSIS

***Credibility of Talbert's Testimony***

The credibility of Talbert's testimony is crucial because, in determining the fourth factor relating to a claimant's RFC to perform past relevant work, the ALJ must evaluate

18

the credibility of a claimant's testimony regarding subjective pain complaints. The underlying issue is the severity of the pain. *Black v. Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints." *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)). An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'" *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected inconsistencies that discredited the Plaintiff's's complaints of pain) (quoting *Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).

The *Polaski* standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;

5. functional restrictions.

> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

Interpreting the *Polaski* standard, §§ 404.1529 and 416.929 discuss the framework for determining the credibility of subjective complaints, e.g., pain. An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000). This duty is fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly examined the factors before discounting the claimant's testimony. An ALJ is "not required to discuss methodically each *Polaski* consideration." *Id.* at 972.

Federal regulations provide that the ALJ must consider all symptoms, "including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R. § 416.929. Medical "signs" are defined as:

> anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

> "Laboratory findings" are defined as: "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

20 C.F.R. § 416.928(c).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record.  Ruling 96-7p provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> * The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).[7]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain.  *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason"

---

[7]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Talbert's case, the record illustrates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Talbert's subjective pain complaints.   In making the credibility determination, the ALJ concluded that the evidence failed to support Talbert's allegations regarding the extent of her symptoms and limitations.  Examples are the lack of evidence showing that Talbert had a blood clot between 1994 and 2000 after she fell from a horse, and she had only one red spot that might have been a superficial vein thrombosis as opposed to the ten or twelve spots alleged by Talbert.  The ALJ also considered Talbert's noncompliance with her treatment insofar as Talbert did not obtain properly fitting stockings and often failed to take her medications, including her diuretics, as prescribed.  The ALJ noted inconsistencies between: her November 5, 2002, report with respect to her ability to walk, stand and sit; her testimony; and her ability to sit throughout the eighty minute hearing.   The ALJ also noted the discrepancy between Talbert's testimony  with respect to her alleged need to elevate her legs four or five times daily for one hour, and her description of her daily activities that included no mention of elevating her legs.  The ALJ also considered Talbert's daily activities that included: being a full-time college student; helping in an auto body shop; bottle feeding a cow; preparing meals; driving daily; vacuuming; sweeping; and washing dishes.  (Tr. 41.)  *See Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996) (affirming the ALJ's discount of claimant's subjective complaints of pain, where the plaintiff cared for one of his children on a daily basis, drove a car infrequently, and occasionally went grocery shopping).

The ALJ explained little weight was given to Dr. Woodruff's opinion that Talbert  is disabled and unable to work because the objective medical evidence in the record,

22

including Dr. Woodruff's own progress notes, repeatedly reflected Talbert's noncompliance with suggested treatment options and did not support her opinion.

In summary, the ALJ thoroughly considered Talbert's subjective pain complaints, the reports of treating physicians, reports of agency physicians, and Talbert's own statements. The ALJ correctly engaged in the *Polaski* analysis. The ALJ set out the standards stated in §§ 404.1529 and 416.929, and the ALJ acknowledged the *Polaski* standard as well as applicable regulations and SSR 96-7p. The ALJ's conclusion that Talbert's pain is not severe enough to prevent him from engaging in her past relevant work as a telemarketer was well-founded, and followed an appropriate express credibility determination regarding Talbert's assertion of subjective complaints. The ALJ's credibility decision was well-supported and based on a thorough analysis.

Therefore, the ALJ appropriately determined that Talbert's testimony was not credible with respect to the extent of her symptoms and limitations.

**Past Relevant Work**

The ALJ bears the primary responsibility for assessing Talbert's RFC based on the relevant evidence. However, Talbert's RFC is a medical question. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001). The ALJ must resolve any conflict in the medical evidence. *Id.* However, some medical evidence "'must support the determination of the claimant's [RFC], and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" *Id.* at 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). "To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" *Id.* (quoting *Lauer,* 245 F.3d at 704).

In Talbert's case, the ALJ followed the procedures in determining that Talbert retained the RFC to return to her past relevant work as a telemarketer.  The ALJ considered, among other things, records from both treating and agency physicians. Conflicts existed among those opinions, and therefore the ALJ examined factors including, but not limited to Talbert's failure to take her medications, including her diuretics, and to obtain stockings that fit.  Taking all of this evidence as well as additional relevant evidence into consideration, the Court finds that the ALJ properly determined the fourth step of the inquiry.

Therefore, this Court agrees that the ALJ properly determined that Talbert could return to her past relevant work as a telemarketer.

### Residual Functional Capacity ("RFC")

RFC is defined as what Talbert "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).  RFC is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of her limitations.  *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c).

The ALJ must determine RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of her limitations.  *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). Before determining RFC, an ALJ first must evaluate the claimant's credibility.  In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  *See Polaski,* 739 F.2d at 1322; *see also* § 404.1529.  Subjective

24

complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322.  A lack of work history may indicate a lack of motivation to work rather than a lack of ability.  *See Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (stating that a claimant's credibility is diminished by a poor work history).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall,* 274 F.3d at 1218.

In this case, the ALJ set out the language describing the appropriate standard under *Polaski* and § 404.1529.  (Tr. 36-37.)  The ALJ summarized Talbert's testimony and described her daily activities according to the testimony and documentary evidence.  (Tr. 39-41.)  The ALJ specifically considered, in addition to Talbert's testimony, documentary evidence including reports of treating physicians, a RFC assessment, and the testimony of William Vincent Tucker, the vocational expert under contract with the SSA.  The VE opined that Talbert had the RFC to perform her past relevant work as a telemarketer even if she needed to alternatively sit and stand.  The VE also noted that, if Dr. Crockett's report (Tr. 416-26)[8] were considered, Talbert could perform all of her past relevant work.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 30th day of March, 2006.

BY THE COURT:

---

[8]The ALJ erroneously referred to Exhibit 21F (Tr. 400-15) as Dr. Crockett's records.

S/Laurie Smith Camp
United States District Judge